UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RECEIPT #_____
AMOUNT $_____
SUM_____
LCC_____
WA_____
MC_____
AO J20 OR_____
BY DPTY CLK_____
DATE _____

|  |  |
|---|---|
| BALBIR SINGH,<br><br>     Plaintiff,<br><br>     v.<br><br>MGI PHARMA, INC., and<br>MGI PHARMA BIOLOGICS, f/k/a<br>ZYCOS, INC.<br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.:

05   11671 GAO

## COMPLAINT

### INTRODUCTION

This is an action for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of implied contract, unjust enrichment, and unfair and deceptive trade practices. The plaintiff, Dr. Balbir Singh ("Dr. Singh") was engaged by defendant Zycos, Inc. ("Zycos") to assist Zycos' management and to serve as a critical member of the Zycos team attempting to keep the company afloat and to position and market the company for potential acquisition – a process that culminated in the $50 million acquisition of the company by defendant MGI Pharma, Inc. ("MGI Pharma"). Under an agreement between Dr. Singh and Zycos, under the clear understanding of the parties, and consistent with the prior course of dealing between the parties, Dr. Singh was entitled to receive both a monthly fee for consulting services and – in the event Zycos were acquired by a major pharmaceutical company – an incentive bonus. These aspects of Dr. Singh's compensation were never at any point questioned by Zycos until *after* MGI Pharma acquired Zycos. Following its acquisition of Zycos, however,

MGI Pharma refused to pay Dr. Singh either his incentive bonus or his final two months of consulting fees. Defendants' willful breaches of their legal and equitable obligations to Dr. Singh have damaged him in excess of $1.5 million. Because Defendants have willfully breached known contractual obligations and because Zycos, in order to induce Dr. Singh to continue to provide professional services, falsely and deceptively made repeated reassurances to Dr. Singh that he would be paid an incentive bonus (including specific reassurances which were made concerning the MGI Pharma transaction), Defendants have engaged in unfair and deceptive trade practices under Mass. Gen. L. c. 93A. Therefore, Dr. Singh's damages should be trebled, and he should be awarded his costs and attorneys' fees.

## **PARTIES**

1. Dr. Singh is an individual with a principal residence at 1 rue des Castors, 68110, Illzach, France.

2. On information and belief, defendant MGI Pharma is a publicly traded corporation, incorporated in Delaware, with a principal place of business at 5775 W. Old Shakopee Road, Suite 100, Bloomington, Minnesota. Upon information and belief, MGI Pharma is the successor-in-interest to the rights and obligations of Zycos.

3. On information and belief, defendant MGI Pharma Biologics, (f/k/a Zycos, Inc.) is a wholly owned subsidiary of MGI Pharma with a principal place of business at 44 Hartwell Avenue, Lexington, Massachusetts.

## JURISDICTION AND VENUE

4.  This Court has personal jurisdiction over defendant MGI Pharma Biologics, f/k/a Zycos, Inc. ("Pharma Biologics" or "Zycos") because Pharma Biologics has a principal place of business in Lexington, MA.  Venue also is proper in this Court because of Pharma Biologics has a principal place of business in this District, and because a substantial part of the events giving rise to Dr. Singh's claims took place in this District.

5.  This Court has personal jurisdiction over defendant MGI Pharma, Inc. ("MGI Pharma") because it has transacted business in the Commonwealth of Massachusetts, and the acts complained of arise out of its transaction of business here, pursuant to M.G.L. c. 223A, §3.

6.  This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because defendant Pharma Biologics is a citizen of this state and Dr. Singh is a subject of a foreign state, and because Dr. Singh has been damaged in an amount in excess of $75,000, exclusive of interest and costs.

## FACTUAL ALLEGATIONS

### Zycos Seeks Dr. Singh's Assistance In 2003

7.  During calendar year 2003, Zycos, at the direction of its then-president and CEO, Mark Philip ("Dr. Philip"), began approaching pharmaceutical companies to ascertain their interest in entering into a major licensing transaction concerning a Zycos product known as ZYC101a.

8.  At that time – and at all relevant times until the acquisition of Zycos by MGI Pharma in or about September 2004 – Zycos was a privately held corporation.  Zycos' activities focused on the creation and development of oncology and antiviral products.

3

9. In furtherance of the task of identifying and securing a licensee for ZYC101a, Dr. Philip approached Dr. Singh and asked him to assist Zycos as a business development consultant. Dr. Singh was asked to participate in and facilitate the search for a licensee by performing a variety of services for Zycos.

10. Dr. Singh is an internationally recognized business development consultant with substantial expertise in the pharmaceutical industry and substantial experience putting together transactions involving pharmaceutical companies.

11. The services Dr. Philip and Zycos asked Dr. Singh to provide included, without limitation, helping the company remain afloat during a difficult period by attracting investment and bridge financing; helping to position the company in the marketplace so it would be attractive to potential licensees; helping the company develop negotiating strategies with respect to potential licensees; and helping the company identify potential licensees.

12. Upon information and belief, Dr. Philip was acting, at least in part, on the instructions and/or with the approval of the Zycos Board of Directors, including of Daniel Green and Arda Minocherhomjee, two members of the Zycos board of directors who have also at all relevant times acted as the Board representatives of key institutional investors in Zycos. (Daniel Green and Arda Minocherhomjee will be referred to herein jointly as "the Investor Representatives").

13. Upon information and belief, the Investor Representatives had, at least until the time when Zycos was acquired by MGI Pharma, authority to make decisions on behalf of Zycos and to bind Zycos.

14. The Investor Representatives in any event had the apparent authority to make decisions on behalf of Zycos and to bind Zycos.

4

15. Dr. Singh and Zycos entered into a written agreement ("the 2003 Agreement") through which Dr. Singh agreed to perform professional services for Zycos, and through which Zycos agreed to compensate Dr. Singh for performing such professional services.

16. The 2003 Agreement, in addition to providing that Dr. Singh would be compensated on an hourly or daily basis for his time, provided that he would receive an incentive bonus upon the execution of a definitive agreement between Zycos and a major pharmaceutical company.

17. The understanding of Zycos and Dr. Singh with respect to the 2003 Agreement was that Dr. Singh would be paid an incentive bonus in the event that any major pharmaceutical company reached a definitive agreement with Zycos during the time period established by the 2003 Agreement.

18. In accordance with the 2003 Agreement, Dr. Singh advised and assisted Zycos, and in particular provided advice and assistance to Zycos with respect to the potential licensing of ZYC101a by Bayer AG ("Bayer"), which had expressed substantial interest in such a transaction.

19. Despite expressing substantial interest in and performing due diligence on Zycos and ZYC101a (a process that included the negotiation of a draft term sheet), Bayer ultimately did not consummate any such transaction with Zycos. Nor did any other entity consummate a definitive agreement with Zycos during the time period established by the 2003 Agreement.

20. As such, Dr. Singh did not receive any incentive bonus in connection with the 2003 Agreement.

### Zycos Again Seeks Dr. Singh's Assistance

21. Following the failure of Zycos to license ZYC101a to a major pharmaceutical company, Zycos faced major funding problems and faced a substantial need for additional cash to fuel its day-to-day operations.

22. Upon information and belief, the Investor Representatives and Dr. Philip decided that the best strategy would be to seek an acquirer or major strategic partner for Zycos.

23. Upon information and belief, in late 2003 Zycos engaged SG Cowen and Co., LLC, a/k/a S.G. Cowen Securities Corporation ("SG Cowen") to assist Zycos in the process of positioning Zycos for acquisition. SG Cowen's initial efforts were not successful, however, prompting Zycos to seek additional assistance.

24. In or about February 2004, Zycos approached Dr. Singh and asked him to again assist Zycos as a business development consultant, and to participate in the search for an acquirer or major strategic partner for Zycos by providing a variety of services to Zycos.

25. The initial overtures to Dr. Singh were made by Dr. Philip. Dr. Philip expressed to Dr. Singh that the efforts of SG Cowen in locating an acquirer had not been successful, and that the company wished to seek additional assistance in this endeavor.

26. The Investor Representatives also contacted Dr. Singh seeking his assistance. During February and March 2004, Dr. Singh engaged in telephonic and electronic communications with Dr. Philip and the Investor Representatives concerning the potential engagement of Dr. Singh.

27. Without limitation, these communications included an email of March 16, 2004 from Dr. Philip to Dr. Singh which stated, in relevant part:

You could help us in several ways through your extensive experience and contacts:
1.   Identify potential new M&A candidates or rejuvenate those companies we have already spoken to
2.   Help prepare materials that will help sell ZYCOS for the best value possible
3.   Help strategize on how we can negotiate the best deals

28. Dr. Singh was interested in helping Zycos particularly because, as a result of the Bayer transaction not being consummated in 2003, he had not received an incentive bonus despite putting significant effort into making that potential transaction a success.

6

29. On March 24, 2004, the Investor Representatives contacted Dr. Singh and asked him to travel the next day to Boston to participate in urgent meetings concerning Zycos. Dr. Singh agreed to do so and traveled to Boston, where he participated in meetings with the Investor Representatives and other Zycos representatives from March 25 to March 28, 2004.

30. During private meetings with the Investor Representatives on March 25, 2004, the Investor Representatives advised Dr. Singh that the financial status of the company, as well as the need for Zycos to locate an acquirer or strategic partner, had become critical. The Investor Representatives told Dr. Singh that they had lost confidence in the direction of the company, and that they believed that locating an acquirer or strategic partner was essential to the future of the company. They told him that the institutional investors they represented had invested significant amounts of money in the company and wished to find an exit from their Zycos investments as quickly as possible.

31. The Investor Representatives again asked Dr. Singh to help position Zycos for an acquisition or strategic partnership by providing a variety of services to Zycos. The services they asked Dr. Singh to provide included, without limitation, helping the company remain afloat during a difficult period by attracting investment and bridge financing; positioning the company in the marketplace so it would be attractive to potential acquirers; helping the company develop negotiating strategies with respect to potential acquirers; and helping identify and evaluate potential acquirers.

32. The Investor Representatives made it clear to Dr. Singh that his duties would include making follow-up contacts and counseling Zycos with respect to potential acquirers who had previously been contacted, including potential acquirers who had previously been contacted by SG Cowen.

33. During these discussions, it was the clear understanding of Dr. Singh and the Investor Representatives that Dr. Singh would be compensated in accordance with the same basic structure as had been established through the 2003 Agreement in the event Zycos were acquired (that is, through monthly consulting fees and incentive bonus), regardless of whether or not Dr. Singh had initially contacted the acquirer or had subsequent contacts with the acquirer.

34. It was also the clear understanding of Dr. Singh and the Investor Representatives that the incentive bonus Dr. Singh would receive – in the event Zycos were acquired – would be in consideration of the overall services he had provided throughout the process and the value his presence on the Zycos team had brought to the search for an acquirer.

35. During their Boston meetings with Dr. Singh, the Investor Representatives also told Dr. Singh that they intended to remove Dr. Philip as CEO of the company and replace him with another Zycos officer, Dr. Mary Lynne Hedley ("Dr. Hedley").

36. Dr. Singh advised the Investor Representatives that if Dr. Philip were stripped of all responsibilities with Zycos, this would reflect poorly on Zycos and make it more difficult for the company to locate an acquirer or strategic partner. Dr. Singh recommended that Dr. Philip be kept on as chairman of the Zycos board of directors.

37. Dr. Singh also told the Investor Representatives that, in light of his belief that the outright removal of Dr. Philip would hamper the search for an acquirer or strategic partner and reflect poorly on the company, he would agree to rejoin the Zycos team only if Dr. Philip were retained as chairman. The Investor Representatives agreed that Dr. Philip would be retained as chairman of the Zycos board of directors.

8

38. It was expressly understood by Dr. Singh and the Investor Representatives that Dr.
Singh, in consideration of joining this effort, expected and deserved to receive an incentive
bonus if a major transaction were consummated as a result of the Zycos team's efforts.

39. Upon information and belief, Dr. Philip was told by the Investor Representatives of
his removal as CEO of Zycos within the next two days.

40. Upon information and belief, the Investor Representatives, acting on Dr. Singh's
recommendation, asked Dr. Philip to stay on as chairman of the Zycos board of directors. Dr.
Philip agreed.

41. Prior to leaving Boston on March 28, 2004, Dr. Singh also met with Dr. Hedley. Like
the Investor Representatives, Dr. Hedley described Zycos' situation as dire and told Dr. Singh
that his services to Zycos would be essential to the survival of the company. She told Dr. Singh
that she lacked experience in such business matters and needed to rely on his expertise. As had
the Investor Representatives, she welcomed him as a key member of the Zycos team.

## Mary Lynne Hedley Takes Helm of Zycos, and the Zycos Team
## Commences Active Search for An Acquirer

42. Dr. Hedley, having replaced Dr. Philip as CEO of Zycos in April 2004, became Dr.
Singh's primary contact at Zycos. Dr. Singh's other substantive communications with Zycos
occurred primarily through the Investor Representatives.

43. At Zycos' request – including the specific requests of Dr. Hedley and the Investor
Representatives – Dr. Singh, as of April 2004, again began performing professional services for
Zycos.

44. From this point forward, Dr Singh, Dr. Hedley, Robert G. Urban, PhD, and the
Investor Representatives functioned as a team working collaboratively to identify potential
acquirers.

9

45. Zycos, in order to better position itself in the search for a potential acquirer and to attract investment, began highlighting the addition of Dr. Singh to the Zycos team in the company's marketing communication with potential acquirers. By way of example, Dr. Hedley, in advance of a teleconference with a potential institutional investor, sent an email dated April 5, 2004 to a representative of the potential institutional investor which stated, in part, that "[Dr. Singh] will be working closely with us to close a deal in the next several months. . . I think will you be quite impressed by his credentials and level of experience, indeed [sic] we are fortunate that he has agreed to work with the ZYCOS team."

46. By way of further example, without limitation, in a "Zycos Information Memorandum: Executive Summary" dated April 26, 2004, Dr. Singh was listed, under the title "Business Development," after Dr. Hedley before Robert G. Urban, PhD, as one of three "key management" team members of Zycos.

47. The April 26, 2004 Executive Summary also listed Dr. Singh at the end of the document as one of five members of Zycos "Top Scientific and Professional Management Team." Concerning Dr. Singh, it stated that:

Balbir Singh, Ph.D., brings extensive business development experience to ZYCOS from Roche, ICN and Xerion Pharma. As an active advisor to the Company, Dr. Singh provides guidance in many aspects of the Company's business development, including deal structure and negotiations.

48. Upon information and belief, Zycos' intent in including Dr. Singh prominently in such materials was to capitalize on his well-established international reputation and business credentials in order to better position the company in its search for an acquirer or strategic partner.

49. As the search for a potential acquirer began, Zycos also faced the task of raising additional funds to fuel the company's day-to-day operations. In early April 2004, Zycos made a

10

presentation to various investors in the company requesting bridge financing. A PowerPoint presentation to investors at that time made prominent use of Dr. Singh's name. In particular, in a slide with the headline "Why invest?" the following information was provided:

> Balbir Singh, consultant to ZYCOS – unparalleled experience in all aspects of business development, with knowledge of both large pharma and small company deal structures. History of closing deals, over 160 deals to date.

50. Dr. Singh participated in this and other presentations to investors and potential investors by phone, and in the course of doing so answered specific questions from investors and potential investors concerning his role in the search for an acquirer and the overall prospects for the company.

51. As a result of the presentations in which Dr. Singh's name was featured prominently and in which he played an active and key role, $1.9 million in bridge financing was extended to Zycos, primarily by the institutional investors represented by the Investor Representatives.

52. In recognition of Dr. Singh's importance to the process that resulted in the bridge financing, Dr. Hedley sent an email to Dr. Singh dated May 3, 2004 that stated, in relevant part, ". . . we are deeply appreciative of your many efforts at helping us to convince investors that a reasonable amount of money needs to flow into the Company in order for us to accomplish our goals."

53. In addition to including Dr. Singh prominently in materials such as the April 26, 2004 Executive Summary and the presentation to investors, Zycos also asked him to take an active role in promoting Zycos' name among major pharmaceutical companies. Although no formal written agreement had been reached between the parties at that time, Dr. Singh was willing to perform such services, in addition to assisting the company in its quest for financing, in reliance on the company's good faith.

54. Dr. Singh's understanding was the basic structure of a deal was then in place, and that he would be compensated in accordance with the same basic structure as had been established through the 2003 Agreement in the event Zycos were acquired (that is, through monthly consulting fees and incentive bonus), regardless of whether or not Dr. Singh had initially contacted the acquirer or had subsequent contacts with the acquirer.

55. Dr. Singh's further understanding was that Zycos would in good faith negotiate the language of a written agreement that established his compensation through (i) consulting fees and (ii) an incentive bonus. He based this understanding on, without limitation, his previous contractual relationship with Zycos, in which exactly such a compensation structure had been established; his clear statements to Zycos in late March 2004 concerning his expectations concerning compensation; and the clear statements of Zycos, the Investor Representatives, Dr. Philip, and Dr. Hedley to Dr. Singh both that his expectations were understood, and that the specific language of the agreement would be negotiated in good faith.

56. Absent Zycos' agreement on the incentive bonus, Dr. Singh would not have agreed to provide any services to Zycos with respect to the search for an acquirer. Among other reasons, Dr. Singh would not have agreed to join the Zycos team on terms materially inferior to those established through the 2003 Agreement. Further, a business development consultant of Dr. Singh's stature would not have agreed to assist Zycos – thereby foregoing other professional opportunities – if the opportunity had not existed to receive compensation significantly over and above a monthly consulting fee of $25,000.

## Agreement Is Reached on Material Terms of Incentive Bonus

57. By the end of April 2004, Dr. Singh and Zycos had reached agreement on the material terms of Dr. Singh's incentive bonus. To memorialize this agreement, Daniel Green

12

sent an email dated April 24, 2004 to Dr. Singh, Dr. Hedley, and Arda Minocherhomjee stating,

in its entirety, as follows:

> This email is to summarise [sic] the conference calls today between Arda,
> Balbir and me. The result was that Balbir would be paid a success fee
> related to the value of the sale of Zycos as follows
> 2% if the proceeds are less than $50m
> 3% if the proceeds are $50m or more.
> Mary Lynne: would you ask Covington and Burling as soon as possible to
> draft a simple contract that has this effect.
> Many thanks and have a good weekend.
>         Danny
>         Daniel Green

58. All parties to Daniel Green's email of April 24, 2004 understood that email to

constitute agreement concerning the material terms of the incentive bonus agreement.

## Draft Agreement Sets Forth Professional Services Dr. Singh is to Provide

59. Following Dr. Singh's receipt of Daniel Green's April 24, 2004 email, direct

exchanges continued between Dr. Singh and Dr. Hedley concerning the documentation of Dr.

Singh's agreement with Zycos. Dr. Hedley represented to Dr. Singh that a written contract was

being drafted by Zycos' lawyers, as Daniel Green had directed Dr. Hedley.

60. Initially, Dr. Hedley indicated to Dr. Singh that terms of Dr. Singh's consulting

compensation and the terms of the incentive bonus would be set forth in two separate documents.

61. In an email dated April 26, 2004, Dr. Hedley sent Dr. Singh as an attachment a draft

agreement setting forth his overall responsibilities to Zycos, as well as the terms of his monthly

compensation for consulting services. It remained the understanding of Dr. Singh and Dr.

Hedley that with respect to the incentive bonus, the material terms of Dr. Singh's compensation

had been agreed upon, as set forth in Daniel Green's email of April 24, 2004.

13

62. Section 1(a) of the draft Agreement stated, in relevant part, "ZYCOS hereby retains

Professional, and Professional hereby agrees, to provide []consulting, advisory and related

professional services."

63. Some of the professional services Dr. Singh was to provide were set forth on Exhibit

1 to the draft Agreement, which stated as follows:

> Professional Services anticipated (this list is not intended to define all
> Professional Services required):
>
> Advise ZYCOS management on negotiation strategies to ensure a rapid closing of
> a deal with currently interested parties (those with whom we have had one or
> more meetings)
>
> Assess current companies interested in licensing ZYC101a or purchasing ZYCOS
> in part or entirety, define the negotiation position and strategy of each company to
> date, and advise ZYCOS on alternate strategies and opportunities to build the
> value of the deal
>
> Provide support in negotiations at the table as necessary
>
> Identify a short list of back up companies, contact and entice the companies to
> look at the opportunity

64. The above provisions of the draft Agreement would remain the same in the final

executed Agreement.

65. As Dr. Singh continued to perform professional services on Zycos' behalf and at the

request of Zycos, communications continued between him and Dr. Hedley concerning the

contract documentation. These communications reflected that agreement on the material terms

of the incentive bonus had already been reached. For example, without limitation, on May 1,

2004, Dr. Singh sent an email to Dr. Hedley making reference to "the incentive bonus and

incentive agreement and the conditions agreed already" and making clear, among other things,

that an incentive bonus would be paid to Dr. Singh in the case of either the sale of Zycos or the

merger of Zycos with another entity.

66. On May 6, 2004, Dr. Singh sent an email to Dr. Hedley with comments on the draft agreement. Dr. Singh also stated, in reference to the separate document that would set forth the terms of his incentive bonus: "Please let me know when I [sic] expect the other agreement draft."

67. Dr. Hedley responded with an email dated May 12, 2004 stating in part that "I have spoken to the lawyers and it is anticipated that both agreements will be reviewed and sent to you by the end of the week."

68. When the agreements did not arrive by the end of the week as Dr. Hedley had represented, Dr. Singh wrote Dr. Hedley on May 17, 2004, asking "[a]ny progress on the two agreements?"

69. Dr. Hedley responded with an email dated May 17, 2004, stating that:

> The lawyers have the agreement now- they actually want to combine the consulting and incentive agreements so it is clear that they together comprise the relationship and there are no discrepancies between the 2. I had a redlined copy last night and sent back to the lawyer this morning. I should have back by this afternoon.

70. As Dr. Singh had awaited the draft of the Agreement, he had also, at Zycos request, continued to engage in efforts on Zycos' behalf to locate an acquirer or strategic partner for the company.

71. For example, without limitation, Dr. Singh had sent an email to Dr. Hedley dated May 26, 2004 detailing numerous contacts he had made with potential acquirers/strategic partners.

72. The purpose of Dr. Singh's email was not to keep track of potential acquirers contacted by Dr. Singh (as opposed to other members of the team), but rather to apprise Dr. Hedley of these potential acquirers and allow her to add these names to the overall list of potential acquirers.

15

73. On May 27, 2004, Dr. Hedley sent to Dr. Singh by email a draft of the contract,

which now embraced both the consulting fee arrangement and the contingent incentive bonus in

one document reflecting the overall relationship.

74. The non-exclusive list of professional services to be provided by Dr. Singh remained

the same.

75. Section 3 of the draft Agreement was entitled "Compensation and Expenses;

Incentive Bonus."

76. Section 3(a) of the draft Agreement stated that "[d]uring the Term, ZYCOS shall pay

Professional $25,000 per month for Professional's satisfactory performance of the Professional

Services."

77. Section 3(b) of the draft Agreement provided that Dr. Singh would be reimbursed for

certain expenses, "including reasonable travel, lodging and meal expenses."

78. Section 3(f) of the draft Agreement provided that:

> In addition to the fees and expenses set forth in Sections 3(a) and (b),
> unless this Agreement is terminated by ZYCOS pursuant to Section 15(b),
> Professional will also be eligible to receive an Incentive Bonus, pursuant to the
> terms and conditions set forth on Exhibit 2, in the event of a Sale Transaction or
> Strategic Partnership (in each case, as defined in Exhibit 2) that is consummated
> during the Term of this Agreement or the twelve month period following the last
> day of the Term of this Agreement.

79. Exhibit 2 of the draft Agreement provided, in part:

> If a Sale Transaction is consummated, or a definitive agreement providing for a
> Sale Transaction is executed, during the term of this Agreement or during the
> Residual Period, Professional shall be paid a Sale Transaction Bonus equal to:
> (i) 2% of the Aggregate Consideration if the Aggregate Consideration is less than
> $50,000,000; or (ii) 3% of the Aggregate Consideration if the Aggregate
> Consideration is equal to or greater than $50,000,000.

80. Exhibit 2 stated that a "Sale Transaction" would be defined as, in relevant part:

one or a series of transactions whereby, directly or indirectly, control of or a material interest in ZYCOS or any of its businesses or assets are transferred to or combined with a Purchaser. . .

81. Exhibit 2 stated that a "Purchaser" would be defined as:

any of the entities listed on Schedule A (as such schedule may be amended by mutual agreement of ZYCOS and Professional) under the heading "Potential Purchasers/Developers" or any entity formed by or affiliated with such entity and for which Professional has, to the extent requested by ZYCOS, assisted ZYCOS in the offer, negotiation, documentation and closing of a Sale Transaction during the Term of this Agreement and the Residual Period, such assistance to include, without limitation: (i) preparing information and materials for meetings with representatives of the Potential Purchaser/Developer; (ii) following up with the Potential Purchaser/Developer; (iii) consulting with ZYCOS officers, directors and other management personnel regarding the development of negotiating strategies; (iv) assisting in the implementation of negotiating strategies approved by the officer, director or management personnel of ZYCOS by participating in or conducting negotiations; (v) assisting ZYCOS officers, directors and management personnel with the analysis of proposed deal structures and consideration of the strategic fit between ZYCOS and the Potential Purchasers/Developer; (vi) participating in due diligence by ZYCOS with respect to the Potential Purchasers/Developers; and (vii) such other related matters as may be specifically requested by ZYCOS.

82. The May 27th draft of the Agreement was the first draft to reference a "Schedule A"

in its definition of "Purchaser" in Exhibit 2.

83. Upon information and belief, it was initially the intent of Zycos and Dr. Hedley that

that additions to Schedule A would have to be made on a regular basis so that the list would

accurately reflect the list of potential Zycos acquirers.

84. Zycos manifested this understanding of Schedule A on various occasions. For

example, without limitation, Dr. Hedley sent to Dr. Singh an email on May 26, 2004 which made

reference to the revisions that would have to be made to Schedule A – "I would guess weekly or

monthly would be appropriate."

85. On the Schedule A included with the May 27, 2004 draft agreement, three companies

had been listed. Below this, the schedule contained the following annotation: "[Balbir please add

17

all others and we will continue to modify this schedule on a weekly or monthly basis- whatever seems most appropriate."

86. Each of the three companies on the Schedule A included with the May 27, 2005 draft agreement had been initially contacted by representatives of Zycos other than Dr. Singh.

87. The efforts of the Zycos team to identify potential acquirers/strategic partners continued to be viewed not as discrete efforts by individuals, but rather as the collective efforts of a team of individuals. For example, as reflected in an email dated May 28, 2004 from Daniel Green to Dr. Singh and Dr. Hedley and copied to other members of the team, various members of the "Zycos team" were assigned responsibilities for various entities regardless of who had made initial contact.

88. To clarify that there was no misunderstanding as to his role and entitlement to an incentive bonus, Dr. Singh made clear, in an email to Zycos principals on June 18, 2004 (at which time the Agreement still had not been finalized or executed) that the term "Purchaser" in the Agreement would incorporate not simply a list of specific entities, but would instead "include **any and all contacts with third parties**, prior or subsequent to the signature of [the Agreement]."(Emphasis in original email).

89. Dr. Singh's email also stated, in part, that "[i]t is our understanding that Zycos will actively involve me if **any and all contacts** (existing and future) and that I will be informed about the same." (Emphasis in original email.)

90. Arda Minocherhomjee responded in an email dated June 21, 2004 which stated, in its entirety: "I agree. Nothing should be done without your input and advice. Arda." Dr. Singh accepted this affirmation of Zycos' commitment to pay him an incentive bonus if Zycos were

18

purchased by any entity during the term of the Agreement, regardless of how that entity came to have interest in Zycos or who first contacted the entity.

91. In late June or early July 2004, Dr. Singh received at his home what Dr. Hedley had represented would be the final draft of the Agreement, ready for his signature. The Agreement had been executed by Dr. Hedley on behalf of Zycos.

92. The draft which Dr. Singh received, however, still contained a "Schedule A" that listed some, but not all, of the companies which members of the Zycos team had already contacted.

93. Dr. Singh, surprised that Schedule A in any form still remained part of the document, contacted Dr. Hedley by phone to discuss this apparent oversight. Dr. Singh reiterated that the parties had agreed that Schedule A was unnecessary and that Dr. Singh would be paid an incentive bonus with respect to any transaction.

94.    Dr. Hedley advised Dr. Singh that she understood the all-encompassing definition of the term "Purchaser" in the Agreement. She also advised Dr. Singh that she understood that agreement had already been reached between Zycos and Dr. Singh on this very point.

95. Consistent with this, Dr. Hedley advised Dr. Singh that he should annotate the final Agreement, prior to executing it, in accordance with the agreed definition of "Purchaser," to include any and all past and future contacts.

96. In accordance with Dr. Hedley's instructions, underneath the listed entities on Schedule A, Dr. Singh added the following handwritten annotation: "+ company list previous to May 1, 2004 and any future contacts."

97. Dr. Singh then executed the Agreement, initialed each page, and returned it to Dr. Hedley by priority airmail.

98. At no time prior to the consummation of the transaction in which MGI Pharma purchased Zycos for $50 million did anyone at Zycos object to the annotations Dr. Singh had made to the Agreement.

99. Until after the MGI Pharma transaction had been consummated, Zycos, Dr. Hedley, and the Investor Representatives acted consistently with an understanding that a binding written agreement had been reached between the parties upon Dr. Singh's return of the fully executed Agreement, as annotated by Dr. Singh at the direction of Dr. Hedley.

100.   Both Zycos and Dr. Singh continued to act under the Agreement by treating Dr. Singh as a key member of the Zycos team, and Dr. Singh continued to provide professional services to Zycos.

101.   Zycos also continued to act in conformity with the Agreement by paying Dr. Singh for his consulting services pursuant to Section 3(a) of the Agreement. In particular, on August 18, 2004, Dr. Singh sent his bill for consulting services for the months of May, June and July to Zycos, which paid the invoiced amounts.

## MGI Pharma Emerges as Potential Suitor for Zycos

102.   In summer 2004, it became clear to all members of the Zycos team, including Dr. Singh, that MGI Pharma had developed a serious interest in acquiring Zycos. Dr. Singh was an active participant in discussions among the Zycos team concerning the interest of MGI Pharma. Dr. Singh, without limitation, assisted Dr. Hedley and the Investor Representatives concerning negotiating strategy. Dr. Singh also, again without limitation, advised Dr. Hedley and the Investor Representatives concerning getting approval for a potential transaction with MGI Pharma from the Zycos shareholders and the Zycos board of directors.

103. During summer 2004, Dr. Singh had several conversations with Daniel Green in which Daniel Green reaffirmed the commitment of Zycos to pay Dr. Singh an incentive bonus in the event MGI Pharma acquired Zycos. Daniel Green expressed his pleasure to Dr. Singh concerning MGI Pharma's interest and expressed satisfaction over the financial benefit that all members of the Zycos team – including Dr. Singh – would enjoy if the transaction were consummated. Daniel Green also expressed the view to Dr. Singh that the Zycos team should continue its efforts with respect to other potential acquirers until the MGI Pharma transaction was ultimately consummated. Dr. Singh expressed his agreement with this strategy.

104. In late August 2004, a transaction was consummated in which MGI Pharma purchased Zycos for $50 million in cash. Upon information and belief, Zycos became MGI Pharma Biologics, a wholly owned subsidiary of MGI Pharma.

105. Prior to their approval of this transaction, the shareholders of Zycos were presented a document entitled 'Merger Proposal" that summarized the recent history of Zycos' efforts to locate an acquirer, including the activities in which Dr. Singh participated in 2003.

106. As reflected in the Agreement and Plan of Merger concerning the MGI Pharma transaction, SG Cowen was paid a "placement agent fee" of $1 million in connection with the transaction. Dr. Hedley was paid a bonus of $1,027,980; Dr. Philip was paid a bonus of $450,000; and Robert Urban was paid a bonus of $450,000.

107. Following the consummation of the transaction, Dr. Singh received a congratulatory phone call from Dr. Philip, who remained the chairman of the Zycos board of directors at this time.

### Zycos and MGI Pharma Refuse Payment of Incentive Bonus to Dr. Singh

108.  Following the announcement that MGI Pharma intended to acquire Zycos, Dr. Singh abruptly encountered great difficulty getting in contact with the Investor Representatives and with Dr. Hedley.

109.  On September 1, 2004, Dr. Hedley sent a letter to Dr. Singh advising him that "the boards of MGI and ZYCOS have approved a merger agreement." That letter, while making no mention of the incentive bonus due and owing to Dr. Singh, did state that upon receipt of "a bill for any expenses that you have incurred prior to and during the month of August. . . [w]e will then send you payment for these expenses and your fee for August and September."

110.  On September 2, 2004, Dr. Singh had a telephone conversation with Dr. Hedley concerning the incentive bonus which Dr. Singh is owed under the Agreement. During that conversation, Dr. Hedley stated to Dr. Singh that he was not due any incentive bonus because "there were no negotiations" that he took part in with respect to the transaction.

111.  Subsequent to that conversation with Dr. Hedley, Dr. Singh raised the issue of his incentive bonus with Dr. Philip. Dr. Philip expressed surprise that Dr. Singh was being denied an incentive bonus, and indicated that the other members of the Zycos board had also assumed that Dr. Singh would be paid an incentive bonus. Dr. Philip also advised Dr. Singh that the Zycos board of directors had never discussed the possibility of not paying Dr. Singh an incentive bonus with respect to the MGI Pharma transaction.

112.  Notwithstanding Dr. Hedley's affirmation of the undisputed commitment with regard to his monthly fee, and in addition to refusing to pay Dr. Singh an incentive bonus, MGI Pharma and Pharma Biologics have also failed to pay Dr. Singh the $50,000.000 he is owed in

consulting fees for the months of August and September, as well as his unpaid expenses of

$1,107.46.

113.    Section 15(a) of the Agreement provides, in relevant part that:

ZYCOS shall have the right. . . to terminate this Agreement upon thirty days'
prior written notice to Professional. In the event of such termination, Professional
shall be entitled to receive (i) any fee due and payable under Section 3(a) hereof
but not yet paid as of the effective date of termination and (ii) payment of any
expenses paid or incurred by Professional in connection with the performance of
the Professional Services prior to the effective date of termination subject to the
restrictions set forth in Section 3 hereof. . .

114.    In an effort to resolve his dispute with MGI Pharma, Dr. Singh in the months

following the acquisition of Zycos by MGI Pharma contacted former members of the Zycos

board of directors, including Andre LaMotte.

115.    In an email dated September 24, 2004, Andre LaMotte advised Dr. Singh that the

decision to deny Dr. Singh payment of an incentive bonus "was made by the lawyers of the

company, which acquired Zycos."

## COUNT I
## (Breach of Contract – Incentive Bonus)

116.    Dr. Singh repeats and incorporates the allegations contained in all preceding

paragraphs as if fully set forth here.

117.    Through the Agreement, Zycos agreed to pay Dr. Singh (i) $25,000.00 per month

in consulting fees; (ii) expenses, and (iii) an incentive bonus.

118.    Dr. Singh performed all of the professional services requested by Zycos, thus

entitling him to the compensation as provided in the Agreement.

119.    The acquisition of Zycos by MGI Pharma constituted a "Sale Transaction" within

the meaning of the Agreement.

23

120. Dr. Singh, by participating in and facilitating Zycos' search for an acquirer, which resulted in the MGI Pharma "Sales Transaction," provided "Professional Services" to Zycos with respect to the MGI Pharma transaction, including services described in Exhibit 2 of the Agreement, thus entitling him to an incentive bonus pursuant to the Agreement.

121. The services provided by Dr. Singh included, without limitation, (i) "[helping Zycos] strategize on how we can negotiate the best deals," as proposed by Dr. Philip in his March 16, 2004 email recruiting Dr. Singh as a business consultant; (ii) helping the company remain afloat during a difficult period by attracting investment and bridge financing; (iii) positioning the company in the marketplace so it would be attractive to potential acquirers; (iv) helping the company develop negotiating strategies with respect to potential acquirers; and (v) helping identify potential acquirers.

122. Further, Dr. Singh, in addition to having functioned as a leading member of the Zycos team throughout the process that would culminate in the MGI Pharma transaction, provided advice and consultation specifically with respect to the MGI Pharma transaction itself to the extent requested by Zycos. Without limitation, Dr. Singh assisted Zycos in the negotiation of that transaction through advising the team on the development of negotiating strategy and tactics; advised Zycos on the deal structure proposed by MGI Pharma; advised Zycos on the strategic fit between itself and MGI Pharma; and advised Zycos on shareholder/board approval issues.

123. The services provided by Dr. Singh described in the preceding paragraph constituted, without limitation, provision of the following categories of services as described in Exhibit 2 to the Agreement: "consulting with ZYCOS officers, directors and other management personnel regarding the development of negotiating strategies," "assisting ZYCOS officers,

24

directors and management personnel with the analysis of proposed deal structures and

consideration of the strategic fit between ZYCOS and the Potential Purchasers/Developer," and

"participating in due diligence by ZYCOS with respect to the Potential Purchasers/Developers."

124.   Zycos has refused to pay Dr. Singh the incentive bonus, despite multiple demands

over several months from Dr. Singh, thus breaching the Agreement.

125.   Dr. Singh has been damaged by Zycos/MGI Pharma's breach of contract in this

regard in the amount of $1.5 million plus interest.

## COUNT II
### (Breach of Contract – Consulting Fees)

126.   Dr. Singh repeats and incorporates the allegations contained in all preceding

paragraphs as if fully set forth here.

127.   Through the Agreement, Zycos agreed to pay Dr. Singh (i) $25,000.00 per month

in consulting fees; (ii) expenses, and (iii) and incentive bonus.

128.   Dr. Singh performed all of the professional services requested by Zycos, thus

entitling him to the compensation as provided in the Agreement.

129.   More particularly, Dr. Singh, by participating in and facilitating Zycos' search for

an acquirer, which resulted in the MGI Pharma "Sales Transaction," provided "Professional

Services" to Zycos with respect to the MGI Pharma transaction, thus entitling him to payment of

monthly consulting fees pursuant to the Agreement.

130.   Notwithstanding Dr. Hedley's commitment, in her letter of September 1, 2004,

Zycos has refused to pay Dr. Singh his consulting fees or expenses for the months of August and

September 2004 despite multiple demands over several months from Dr. Singh, thus breaching

the Agreement.

131. MGI Pharma's refusal to pay these sums to Dr. Singh, particularly in light of Zycos' previous commitment to do so, constitutes a willful breach of known contractual obligations.

132. Dr. Singh has been damaged by Zycos/MGI Pharma's breach of contract in the amount of $51,107.46 plus interest.

## COUNT III
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

133. Dr. Singh repeats and incorporates the allegations contained in all preceding paragraphs as if fully set forth here.

134. Through the Agreement, Zycos agreed to pay Dr. Singh (i) $25,000.00 per month in consulting fees; (ii) expenses, and (iii) and incentive bonus.

135. Dr. Singh performed all of the professional services requested by Zycos, thus entitling him to the compensation as provided in the Agreement.

136. As described above, Zycos has refused to pay Dr. Singh the incentive bonus or his consulting fees for the months of August and September, despite multiple demands over several months from Dr. Singh, thus breaching the Agreement.

137. Zycos' actions constitute arbitrary or unreasonable conduct which have had the effect of preventing Dr. Singh from receiving the fruits of the Agreement, and thus constitute a breach of the covenant of good faith and fair dealing implied into all contracts governed by the laws of the State of Delaware.

138. Dr. Singh has been damaged by Zycos/MGI Pharma's breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial.

## COUNT IV
### (Breach of Contract Implied-in-Fact)

139. Dr. Singh repeats and incorporates the allegations contained in all preceding paragraphs as if fully set forth here.

140. If for any reason no written contract is found to exist between Dr. Singh and Zycos, an agreement or contract may be inferred by the conduct of Dr. Singh and Zycos as set forth above.

141. In particular, Dr. Singh provided services to Zycos at Zycos's request.

142. The services provided by Dr. Singh included, without limitation, (i) "[helping Zycos] strategize on how we can negotiate the best deals," as proposed by Dr. Philip in his March 16, 2004 email recruiting Dr. Singh as a business consultant; (ii) helping the company remain afloat during a difficult period by attracting investment and bridge financing; (iii) positioning the company in the marketplace so it would be attractive to potential acquirers; (iv) helping the company develop negotiating strategies with respect to potential acquirers; and (v) helping identify potential acquirers.

143. Further, Dr. Singh, in addition to having functioned as a leading member of the Zycos team throughout the process that would culminate in the MGI Pharma transaction, provided advice and consultation specifically with respect to the MGI Pharma transaction itself. Without limitation, Dr. Singh assisted Zycos in the negotiation of that transaction through advising the team on the development of negotiating strategy and tactics; advised Zycos on the deal structure proposed by MGI Pharma; advised Zycos on the strategic fit between itself and MGI Pharma; and advised Zycos on shareholder/board approval issues.

144. Zycos accepted these and other professional services from Dr. Singh.

145.    Zycos obtained a benefit from Dr. Singh as a result of Dr. Singh's efforts on its behalf.

146.    Dr. Singh supplied the services to Zycos with the expectation of receiving fair treatment and just recompense, including consulting fees and an incentive bonus in the event of an acquisition of Zycos.

147.    Zycos accepted Dr. Singh's services and used Dr. Singh in its marketing of itself for potential acquisition with the expectation of providing Dr. Singh fair treatment and just recompense, including consulting fees and an incentive bonus in the event of an acquisition of Zycos.

148.    Zycos has breached the parties' contract implied-in-fact by failing to pay for the services provided by Dr. Singh, and in particular, failing to pay Dr. Singh an incentive bonus as agreed between parties and failing to pay him consulting fees and expenses for the months of August and September as agreed between the parties.

149.    Dr. Singh has been damaged by Zycos's breach in an amount to be determined at trial.

## COUNT V
### (Unjust Enrichment)

150.    Dr. Singh repeats and incorporates the allegations contained in all preceding paragraphs as if fully set forth here.

151.    Dr. Singh provided services to Zycos at Zycos's request.

152.    The services provided by Dr. Singh included, without limitation, (i) "[helping Zycos] strategize on how we can negotiate the best deals," as proposed by Dr. Philip in his March 16, 2004 email recruiting Dr. Singh as a business consultant; (ii) helping the company remain afloat during a difficult period by attracting investment and bridge financing; (iii)

28

positioning the company in the marketplace so it would be attractive to potential acquirers; (iv) helping the company develop negotiating strategies with respect to potential acquirers; and (v) helping identify potential acquirers.

153.    Further, Dr. Singh, in addition to having functioned as a key member of the Zycos team throughout the process that would culminate in the MGI Pharma transaction, provided advice and consultation specifically with respect to the MGI Pharma transaction itself. Without limitation, Dr. Singh assisted Zycos in the negotiation of that transaction through advising the team on the development of negotiating strategy and tactics; advised Zycos on the deal structure proposed by MGI Pharma; advised Zycos on the strategic fit between itself and MGI Pharma; and advised Zycos on shareholder/board approval issues.

154.    Zycos accepted these and other professional services from Dr. Singh, and used Dr. Singh in its marketing of itself for potential acquisition

155.    Zycos obtained a benefit from Dr. Singh as a result of Dr. Singh's efforts on its behalf.

156.    Dr. Singh supplied the services to Zycos with the expectation of receiving fair treatment and just recompense, including consulting fees and an incentive bonus in the event of an acquisition of Zycos.

157.    Zycos accepted Dr. Singh's services with the expectation of providing Dr. Singh fair treatment and just recompense, including consulting fees and an incentive bonus in the event of an acquisition of Zycos.

158.    Zycos and MGI Pharma have retained for themselves funds that in equity should be returned to Dr. Singh.

159. Through its actions as described above, Zycos has been unjustly enriched at Dr. Singh's expense in an amount to be determined at trial.

## COUNT VI
### (Unfair and Deceptive Business Practices)

160. Dr. Singh repeats and incorporates the allegations contained in all preceding paragraphs as if fully set forth here.

161. From the time he was approached by Zycos in February 2004, Dr. Singh made clear that in consideration of agreeing to assist Zycos with locating an acquirer or strategic partner, he expected to receive (i) fees for consulting services and (ii) an incentive bonus.

162. On multiple occasions Zycos, through, without limitation, Dr. Philip, Dr. Hedley and the Investor Representatives, assured Dr. Singh that he would receive an incentive bonus if Zycos were acquired as a result of the efforts of the Zycos team, of which Dr. Singh was an integral part. These assurances were made without qualification.

163. These assurances included statements made in summer 2004 by Daniel Green to Dr. Singh in which Daniel Green manifested the commitment of Zycos to pay Dr. Singh an incentive bonus in the event MGI Pharma acquired Zycos.

164. Zycos, through, without limitation, Dr. Philip, Dr. Hedley and the Investor Representatives, made these assurances with the express purpose of inducing Dr. Singh to remain part of the Zycos team and to continue to provide professional services to Zycos.

165. The assurances given to Dr. Singh were false and misleading, as evidenced by Zycos' subsequent refusal to provide Dr. Singh an incentive bonus.

166. The inaccurate assurances were given to Dr. Singh by Zycos with the knowledge that they were false, or with reckless disregard for their falsity.

30

167. According to the September 24, 2004 email to Dr. Singh from Andre LaMotte, the decision to deny Dr. Singh payment of his incentive bonus "was made by the lawyers of the company, which acquired Zycos."

168. The repeated assurances of Zycos that Dr. Singh would be paid an incentive bonus, coupled with the statement made by Andre LaMotte, demonstrate that MGI Pharma's decision to deny Dr. Singh an incentive bonus was made in reliance on an unfair, pretextual, and deceptive interpretation of the Agreement by MGI Pharma following the acquisition of Zycos, an interpretation made with the intent of depriving Dr. Singh of a lawfully bargained-for and earned incentive bonus.

169. The conduct of Zycos and MGI Pharma as described above, and in particular MGI Pharma's failure to pay Dr. Singh either his consulting fees or the incentive bonus, constitutes a willful breach of known contractual obligations

170. The conduct of Zycos and MGI Pharma as described above rose to the level of unfair and deceptive trade practices, which are proscribed under Massachusetts law by Mass. Gen. L. c. 93A.

171. The unfair and deceptive business practices of Zycos and MGI Pharma as described above occurred primarily and substantially in Massachusetts.

172. Defendants have at all relevant times been engaged in trade and commerce within the meaning of Mass. Gen. L. c. 93A, § 11.

173. As a result of Defendants' unfair and deceptive conduct, Dr. Singh has been damaged in an amount to be determined at trial.

31

## **PRAYERS FOR RELIEF**

The plaintiff, Balbir Singh, respectfully requests that this Court:

1.    Grant him judgment against Defendants on Counts I-VI;

2.    Enter an award of damages against Defendants to compensate Dr. Singh for the
actual damages he has suffered as a result of Defendants' breaches of contract;

3.    Enter an award of damages against Defendants to compensate Dr. Singh in the
amount that Defendants have been unjustly enriched;

4.    Enter an award of punitive damages against Defendants pursuant to Delaware law
based on Defendants' willful breach of known contractual obligations;

5.    Treble any award of damages against Defendants pursuant to M.G.L. c. 93A, § 11
and/or any other relevant statute allowing an award of multiple damages in the
case of unfair and deceptive business practices;

6.    Enter an award of attorneys' fees and costs against Defendants on Dr. Singh's
behalf pursuant to M.G.L.93A, § 11 and/or any other appropriate statute; and

7. Grant Dr. Singh such further relief as is just, warranted, and reasonable under the circumstances.

## JURY DEMAND

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.**

Respectfully submitted,

BALBIR SINGH
By his attorneys,

Joseph L. Stanganelli (BBO #628958)
C. Alex Hahn (BBO # 634133)
Scibelli, Whiteley and Stanganelli, LLP
50 Federal Street, 5th Floor
Boston, MA 02110
(617) 227-5725

Dated: August 12, 2005

33

℡JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

Singh, Balbir

## DEFENDANTS

MGI Pharma, Inc., and MGI Pharma Biologics, f/k/a Zycos, Inc.

(b)  County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Hennepin County, MN
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c)  Attorney's (Firm Name, Address, and Telephone Number)

Joseph L. Stanganelli & Alex Hahn, Scibelli, Whiteley and Stanganelli, LLP, 50 Federal Street, 5th Floor, Boston, MA 02110 (617)-227-5725

Attorneys (If Known)

Christopher T. Shaheen, Dorsey and Whitney, LLP, 50 South Sixth Street, Minneapolis, MN 55402

## II.  BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                     and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☒ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | | |

## V.  ORIGIN  (Place an "X" in One Box Only)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332

Brief description of cause:
Breach of contract and M.G.L. c. 93a claim for unfair and deceptive acts

## VII.  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $   1,500,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII.  RELATED CASE(S) IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE     08/12/2005

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) _Singh_ _v. MBT Pharma_

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

___  I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

___  II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,  *Also complete AO 120 or AO 121
          740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

✓   III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
          315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
          380, 385, 450, 891.

___  IV.   220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
          690, 810, 861-865, 870, 871, 875, 900.

___  V.    150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                            YES ☐       NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

                                                            YES ☐       NO ☑

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                            YES ☐       NO ☑

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                            YES ☐       NO ☐

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                            YES ☐       NO ☑

   A.    If yes, in which division do all of the non-governmental parties reside?

         Eastern Division ☑          Central Division ☐          Western Division ☐

   B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

         Eastern Division ☑          Central Division ☐          Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                                            YES ☐       NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _Alex Hahn_
ADDRESS _50 Federal St. 5th (Flour)_
TELEPHONE NO. _617 - 227 - 5725_

(CategoryForm.wpd -5/2/05)